UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

MARY J. BROOKS,

                Plaintiff,                      Civil Action No.
                                              10-cv-13717

vs.

                                              PAUL D. BORMAN

CENTRAL IRRIGATION SUPPLY, INC.,           UNITED STATES DISTRICT JUDGE

                Defendant.

_____/

**ORDER GRANTING IN PART AND DENYING IN PART DEFENDANT'S MOTION
FOR SUMMARY JUDGMENT (Dkt. No. 12)**

      This is an employment discrimination case. Mary J. Brooks ("Plaintiff") alleges that she was

demoted and laid off by her former employer, Central Irrigation Supply, Inc. ("Defendant"), because

she is a woman and was pregnant. On September 17, 2010, Plaintiff filed a Complaint alleging Title

VII sex and pregnancy discrimination and retaliation. (Dkt. No. 1.) On July 21, 2011, Defendant

filed a Motion for Summary Judgment. (Dkt. No. 12.) Plaintiff responded on August 23, 2011.[1]

(Dkt. No. 14.) Defendant filed a Reply on September 12, 2011. (Dkt. No. 25.) The Court held a

hearing on November 4, 2011.

      For the reasons stated below, the Court will GRANT in part and DENY in part Defendant's

motion.

## II. BACKGROUND

      Defendant is a national company based in New York that sells agricultural and irrigation

---

      [1]Plaintiff also filed an Ex-Parte Motion for Extension of Time, because the Response was
filed one day late. (Dkt. No. 23.) The Court granted Plaintiff's ex-parte motion. (Dkt. No. 24.)

equipment to commercial customers.  It is 95% owned by Bernardo Luciano.  Defendant has 35 branches nationwide, but only three female branch managers.

In May 2007, Plaintiff was hired to work as a counter sales person at Defendant's Commerce Township location in Michigan.  After about one year, Plaintiff was promoted to a branch manager position.  Plaintiff was one of two female branch managers in Michigan, with the other female branch manager located in Troy, Michigan.  However, the manager at the Troy location was later demoted and replaced by a male branch manager.

In early 2008, Plaintiff became pregnant.  Although Defendant's employee manual provided for 12 weeks of unpaid leave pursuant to the Family Medical Leave Act ("FMLA"), Defendant did not have 50 or more employees within 75 miles of its Commerce Township location.  Plaintiff was thus technically excluded from the FMLA's provisions. *See* 29 U.S.C. § 2611(2)(B)(ii).  However, Plaintiff was assured by Defendant's Human Resources department that she would be allowed 12 weeks of unpaid leave and was guaranteed to get her job back at the end of her leave.[2]  Plaintiff worked throughout her pregnancy and began her leave on October 4, 2008, the day she gave birth to her son.

On December 8, 2008, while Plaintiff was still on maternity leave, Defendant hired Mark Natale.  The New Hire Form completed for Natale reflects that he was hired for the "Store Manager" position at the Commerce Township location.  (Pl.'s Resp., Ex. 7, New Hire Form.)  However, Defendant states that "[f]rom October 2008 to February 2009 there was no manager [at the Commerce Township location].  The Regional Manager, Terry Krohn, covered the store and Mark

---

[2]Defendant has conceded that, although it has no set policies regarding pregnancy leave, Plaintiff was on valid leave.  This issue is thus not disputed by Defendant. (Pl.'s Resp., Ex. 6, Def.'s Resp. to Interrogs. 3.)

Natale was then a counter person." (Def.'s Resp. to Interrogs. 4.) Natale stated at his deposition that

he believed he was hired to replace Plaintiff in December, but that Defendant told him not to tell any

other employees because Plaintiff's spouse, Christian Brooks ("Christian"), also worked at the

Commerce Township location.

> A     . . . . In talking to Terry [Krohn] that morning [December 8, 2008], Terry asked me not to mention that I was hired as a branch manager. He asked me that, if I was asked about my position, to say that I was there to beef up store operations.
>
> Q     But it was understood between the two of you that you were the branch manager.
>
> A     Correct.
>
> Q     Did you say why not to say you were hired as a branch manager?
>
> A     He did not.
>
> Q     You didn't inquire?
>
> A     I did not inquire. My assumption was that, with being hired to replace a, what would soon be a subordinate's spouse, they wanted to speak with him directly about it.
>
> Q     Okay. So he asked you not to say to Christian that you were hired as branch manager.
>
> A     To anyone.
>
> ( . . . . )
>
> Q     Okay. And what did he say about Christian?
>
> A     Forgive me if I paraphrase a little bit, this is a long time ago?
>
> Q     Of course, I understand.
>
> A     Basically, that Christian and Mary were spouses, husband and

3

> wife, and that they wanted – Christian and Mary were
> spouses; they wanted to speak to Christian about it; that it
> wasn't – basically, to let the regional and the corporate office
> handle the title and the transition between Mary and I.

(Pl.'s Resp., Ex. MN, Natale Dep. 16-17.)

Plaintiff planned to return to work at the end of her 12-week leave on December 29, 2008. Plaintiff alleges that when she informed Defendant of her planned return date, her regional manager, Terry Krohn, informed her that he was not expecting her to return at that time. Plaintiff claims that she then called Bernardo Luciano, who explained that "he was reorganizing some of the employees and was not aware of where [Plaintiff] would end up." (Pl.'s Resp., Ex. MB, M. Brooks Dep. 28.) Plaintiff testified that she then told Luciano, "I feel like you're discriminating against me because I'm a woman and because of my pregnancy leave," to which Luciano responded: "don't put words in my mouth." (M. Brooks Dep. 45-46.) Luciano denies that this phone call ever took place.

| | |
|---|---|
| Q | Do you remember a telephone conversation with Mary sometime in late December of 2008 when she believed she was going to return to work? |
| A | I don't remember the phone call. |
| Q | You say you don't remember the phone call at all? |
| A | I didn't have no phone call with Mary in December. |
| Q | Did you have a phone call with her before December? |
| A | I don't recall any phone calls. |
| Q | Did you have a phone call with her after December about her return while she was still on leave? |
| A | I don't remember any phone calls with Mary. |
| Q | Did you have any personal conversations with her while she |

4

was on leave?

A     No.

Q     You know Mary has made an allegation that she had a phone call with you while she was on leave, right?

A     I don't know. I did not have that conversation. I don't know what she's saying. I don't even know what she's saying.

(Pl.'s Resp., Ex. BL, Luciano Dep. 8-9.)

Ralph Sepe, who works in Defendant's Accounting Department as the Controller, stated that Luciano did not allow Plaintiff to return to work on December 29 because the Commerce Township location was taking inventory at that time.

Q     Why did she not come back after 12 weeks?

A     I don't know. I wasn't involved in that discussion.

Q     But you investigated it, you spoke to Bernardo and you prepared a defense to her claim. So did you learn in those discussions with Bernardo or anybody else why Mary wasn't brought back at the end of her 12 weeks?

A     It was my understanding that he wanted to finish the store inventory, which the inventory process, once it's begun, it's better to let it continue. Otherwise, if more people get involved, the process is disrupted, can be disrupted.

(Pl.'s Resp., Ex. RS, Sepe Dep. 9.)

Rex Sparks, who worked as a salesman for Defendant at the time Plaintiff was on maternity leave, stated that Luciano did not want Plaintiff to return from her leave because Luciano wanted a male store manager at the Commerce Township branch.

A     Bernardo's told me the same thing also personally, many times, that he didn't want a, I can't say the word, an "f" woman –

5

Q      Okay.

A        – running the branches.

Q      You can say it.  If that's what he said, say it.

A      Okay, I hate to say, "A fucking woman running his branches."
       He said that to me personally.  I know he said it to another of
       the other salesperson, Joe Biondo, at the same time.  I heard
       it at least three or four times, at least, from Bernardo, that he
       did not like women working his branches, and he had two of
       them in Michigan.

(Sparks Dep. 13.)   Sparks also testified that, according to Terry Krohn, Luciano was concerned

about potential time off that Plaintiff would request due to her child.

Q      Okay.  And at some point, did Mr. Krohn ever discuss with
       you Mary's return?

A      He basically said that she's been trying to come back, but
       Bernardo was dragging his feet on bringing her back, and the
       biggest reason was now she has a baby also.

( . . . . )

A      The biggest issue he had about her, now she was a mother, if
       there's a problem with the child, she's not going to be able to
       come in, somebody's going to have to take care of it,
       somebody's going to have to cover for her; that was his big
       issue, other than being a woman.

(Sparks Dep. 11-14.)

       While Plaintiff was on leave, Terry Krohn asked Christian if he would consider a transfer to

the Troy branch office to "change the manager's files over."  (Pl.'s Resp., Ex. CB, C. Brooks Dep.

14.)  Christian asked Krohn for a written commitment that he would be allowed to return to the

Commerce Township location after he finished his work at the Troy location: "because I didn't want

them, Central, to say, well, you took this transfer, this is where you work now, because I could not

6

for any length of time go to that store. It's too far economically, I couldn't do it." (C. Brooks Dep. 13.) Krohn refused Christian's request, and Christian declined to take the transfer to the Troy branch. On February 9, 2009, the same day Plaintiff was allowed to return to work (M. Brooks Dep. 31), Krohn called Christian and told him that he would be laid off "until things picked up." (C. Brooks Dep. 56.) Christian stated that Defendant has since hired another person to fill his position. (C. Brooks Dep. 30.)

Luciano testified that he wanted to transfer Christian to another store "[b]ecause they [Christian and Plaintiff] have one vehicle for transportation and they're also – when one person couldn't come in, I was told that it was a problem for the other person to come in." (Luciano Dep. 12-13.) Luciano further testified as follows:

> A     I recommended that Terry [Krohn] will extend the job to her husband to another branch so that we wouldn't have to worry about both missing work and having a major problem at the store.
>
> Q     But if they only had one car, how does that help if they're working in two different locations?
>
> A     I can't help that. I was concerned of them not being able to come to work together.

(Luciano Dep. 13.)

When Plaintiff returned to work, she co-managed with Natale, who had been hired as the store manager during her absence. However, in March 2009, Luciano told Plaintiff and Natale that he wanted one manager at the Commerce Township location, and asked Plaintiff and Natale to decide between the two of them who would be the manager. Natale testified that he and Mary "decided she was going to continue as manager and I was going to continue doing the commercial

7

and the spec work." (Natale Dep. 28.)

Plaintiff testified that Luciano frequently criticized her performance after she resumed management of the Commerce Township store. Natale also testified that Plaintiff complained about Luciano's scrutiny:

> A    The early part of that year, when we were both in the branch at the same time, I do remember a specific incident about her complaining that he was, he had called three times on an order she did with a, we call them funny pipe fittings, basically a pipe fitting; it's a very low dollar part. And mentioned and complained to me that he sort of, paraphrasing again, you know, he's called me three times over this part and it's a 20 cent part.

(Natale Dep. 32-33.) Natale testified that Luciano called him frequently, and that Luciano became increasingly critical of his performance:

> Q    How often did you speak with Bernardo, say spring of '09?
>
> A    Spring of '09, almost every day.
>
> ( . . . . )
>
> Q    Did you feel he was fair with you?
>
> A    Spring of '09, yes.
>
> Q    Okay. Did that change at some point?
>
> A    Yes.
>
> Q    When?
>
> A    Roughly, at some point within the next year, after that summer, I would say, going into the next fall.
>
> Q    What happened?
>
> A    As other employees have termed it, myself as well, have used

8

> the phrase, you leave the honeymoon period, where he's very
> nice and charming the first six, eight months or so, and then
> he becomes very hard and likes to yell.

(Natale Dep. 31-32.) Rex Sparks also testified that Luciano frequently scrutinized his managers:

> Q     Okay. Do you have any information that Bernardo was
>       calling Mary a lot or talking to her a lot?
>
> A     During the day he was notorious to call his managers, whether
>       it was Mary or Alicia. If he thought you did one thing wrong,
>       he would literally call her, and she would not be able to be at
>       the counter. Sometimes she would tell him, "I have a
>       customer here, I have to take care of him." And he would
>       literally call you and chew your butt, time and time and time
>       and time again, on the same thing.

(Sparks Dep. 35-36.)

Luciano, however, denied that he called Plaintiff multiple times, claiming to remember only

one telephone conversation with her:

> Q     When Mary returned to work from her pregnancy leave, did
>       you contact her periodically to talk with her about her work?
>
> A     No.
>
> Q     Did you contact her at all to discuss her work with her?
>
> A     I remember having one conversation with her at the branch.
>
> ( . . . . )
>
> Q     Is that the only time you remember talking with her on the
>       phone about her work?
>
> A     Yes.

(Luciano Dep. 32 and 34.)

In the spring of 2009, Dave Truttman was hired to replace Terry Krohn as the regional

manager for Defendant's Michigan stores.  Truttman stated that, in his initial briefings, Luciano

mentioned an inventory problem that he believed had occurred during Plaintiff's management of the

Commerce Township store.

> A    One of the items in particular that he [Luciano] mentioned
>      about Mary Brooks, was he said that the inventory that they
>      did the year prior [in 2008] was $70,000 short, so he wanted
>      me to go, and when I would call on all these larger
>      contractors, 'cause it would take somebody large to absorb
>      something like that, he wanted me to investigate and find out
>      if any of those people got any of the inventory, which I did,
>      and I found nothing; I mean, I did that for a whole year.  That
>      whole first year, I got to know all these contractors and talk to
>      them and dealt with them on a person-to-person basis, and I
>      didn't find any information that led me to believe that that
>      was the case.
>
> Q    When you say that led you to believe that  there was a
>      shortage, in other words?
>
> A    No.  Well, my assumption, and it's just my assumption, I had
>      no proof or anything, was that the inventory in the prior year
>      was really wrong, and that's why it ended up being wrong in
>      the year when Mary did the inventory when she was
>      responsible for it.

(Pl.'s Resp., Ex. DT, Truttman Dep. 9-10.)

Truttman testified that Luciano was convinced that Plaintiff had stolen the missing inventory,

and that he wanted Truttman's investigation to find evidence that Plaintiff was the person

responsible for it.  Truttman disagreed and thought Plaintiff was a valuable employee.  Eventually,

Truttman moved Plaintiff into a newly created position, Assistant to the Regional Manager, in

response to pressure from Luciano to fire Plaintiff and install Natale as the store manager.

> Q    Did Bernardo ever speak with you directly about Mary's
>      performance after you started, after this first meeting in New
>      York?

10

A     The only time he did was when, you know, the economy was really bad, and the sales were not up to snuff, and he continually would tell me, "We Don't [sic] really need her, she's got to go," all right? And I continually told him, "Well, I think there's real value there."

So, I was the one that set her up into a position of my assistant, and moved her into that position, when I saw what was really going on and how he was pushing to make it permanent that Mark [Natale] would be store manager, but I wanted to keep her, because I saw the value. I wanted her in the store yet, because I didn't want to lose the customers that we gained with her.

Q     Did Mr. Luciano give you any more detail about why he didn't want Mary in that position?

A     No. I mean, he always thought that she stole that inventory. He firmly believed that. And he kept bringing it up over and over and over every conversation we had.

Q     This 70,000 bucks?

A     Yeah. Yeah. He wasn't happy with the investigation that I was doing ongoing, you know what I mean.

Q     Okay. And he wasn't happy with the investigation you were doing or the results of the investigation?

A     The results. He wanted the results to be that she took the stuff.

Q     Okay. And you never found any indication.

A     None whatsoever.

(Truttman Dep. 16-18.)

Shortly after she was given the Assistant to the Regional Manager position, Luciano told Truttman that he needed to lay off two people. Truttman then decided to eliminate Plaintiff's employment.

11

Q    Okay. At some point did Mr. Luciano have a conversation with you where he directed you to terminate Mary's employment?

A    No, what he did is he had a conversation with me that went like this: He says, "Look, the market is not improving. We have to layoff two people. You decide who the two people are." So I went through the evaluation process . . . . And at that point, I said, To [sic] have an assistant, that's not adding any value to the company, so it was my decision to lay her off and another salesman off, at the same time.

Q    Okay. Did you discuss that with Bernardo?

A    Yes, I told him exactly what I was going to do.

Q    And what was his reaction?

A    He agreed.

Q    Okay. Obviously, if Mary were still the manager of the Commerce location, you wouldn't have laid her off if she was the manager there, right?

A    Probably not, yeah.

(Truttman Dep. 24-25.)

Defendant asserts that Plaintiff was terminated for performance reasons and for reasons related to market conditions. (Def.'s Resp. to Interrogs. 4.) However, Truttman specified that he did not select Plaintiff for layoff based on her performance. (Truttman Dep. 27.) Mark Natale also testified that the layoffs of Plaintiff and the other employee were not related to market conditions. (Natale Dep. 69.)

At his deposition, Natale could not recall ever hearing Terry Krohn or any other employee express dissatisfaction with Plaintiff's job performance. (Natale Dep. 36.) Natale further testified that he did not believe Luciano treated Plaintiff any differently because she was a woman or because

12

she went on pregnancy leave. (Natale Dep. 37-38.) Dave Truttman also testified that he never had

any issues with Plaintiff's job performance. (Truttman Dep. 27.) According to Truttman, Luciano

agreed with him regarding "the [positive] value of having women sell to contractors." (Truttman

Dep. 32.)

### III. LEGAL STANDARD

Defendant has filed a motion pursuant to Fed. R. Civ. P. 56(c). On summary judgment, the

Court views the evidence and draws all reasonable inferences in favor of the party opposing

summary judgment. *Matsushita Electric Industrial Co., Ltd., et al. v. Zenith Radio Corp., et al.*, 475

U.S. 547, 587 (1986). The moving party bears the initial burden of showing that there is no genuine

issue of material fact. *Id.* Once this burden is met, the opposing party must produce some facts

showing there is a genuine issue for trial. *Id.* If a rational trier of fact could not, based on the record

as a whole, find in favor of the party opposing summary judgment, then summary judgment is

granted in favor of the moving party. *Id.*

### IV. ANALYSIS

Title VII of the Civil Rights Act of 1964 prohibits the discharge of any individual on the

basis of race, color, religion, sex, or national origin. In 1978, Congress amended Title VII to prohibit

discrimination on the basis of pregnancy. *See Newport News Shipbuilding and Dry Dock Co. v.*

*EEOC*, 462 U.S. 669, 670-71 (1983). This amendment, referred to as the Pregnancy Discrimination

Act ("PDA"), provides as follows:

> The terms "because of sex" or "on the basis of sex" include, but are
> not limited to, because of or on the basis of pregnancy, childbirth, or
> related medical conditions; and women affected by pregnancy,
> childbirth, or related medical conditions shall be treated the same for
> all employment-related purposes, including receipt of benefits under

13

> fringe benefit programs, as other persons not so affected but similar
> in their ability or inability to work, and nothing in section 2000e-2(h)
> of this title shall be interpreted to permit otherwise.

42 U.S.C. § 2000e(k). Accordingly, an employer violates Title VII by making "improper distinctions based on pregnancy or potential pregnancy" with regard to its employees. *Ensley-Gaines v. Runyon*, 100 F.3d 1220, 1224 (6th Cir. 1996).

When evaluating claims arising under Title VII, the Court uses the burden-shifting framework established by *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802 (1973). Plaintiff has the initial burden of proving a prima facie case of discrimination. *Id*. If Plaintiff meets her burden, Defendant then must articulate a legitimate, nondiscriminatory reason for its actions. *Id*. If Defendant meets its burden, then Plaintiff must show that Defendant's articulated reason is merely pretextual. *Id*; *see also Ensley-Gaines*, 100 F.3d at 1224.

Plaintiff can meet her burden of showing a prima facie case by presenting either direct evidence or circumstantial evidence of discrimination. "In discrimination cases, direct evidence is that evidence which, if believed, requires the conclusion that unlawful discrimination was at least a motivating factor in the employer's actions." *Jacklyn v. Schering-Plough Healthcare Prod. Sales Corp.*, 176 F.3d 921, 926 (6th Cir. 1999). A prima facie case of discrimination under the PDA is established by showing (1) that the plaintiff was pregnant, (2) she was qualified for her job, (3) she was subjected to an adverse employment decision, and (4) there is a nexus between her pregnancy and the adverse employment decision. *Kocak v. Community Health Partners of Ohio*, 400 F.3d 466, 469 (6th Cir. 2005) (quoting *Cline v. Catholic Diocese of Toledo*, 206 F.3d 651, 658 (6th Cir. 2000).

14

**A. Prima Facie Case**

*1. Direct Evidence*

Plaintiff argues that Luciano's comments constitute direct evidence of discrimination. Plaintiff specifically relies on (1) Rex Sparks' testimony that Luciano "did not like women running his branches"; (2) Sparks' testimony that Luciano thought someone would have to cover for Plaintiff if her child was sick, and (3) Terry Krohn's testimony that Luciano was "dragging his feet" on bringing Plaintiff back from maternity leave because she had a baby.

None of these statements qualify as direct evidence of discrimination. "[D]irect evidence of discrimination does not require a factfinder to draw any inferences in order to conclude that the challenged employment action was motivated at least in part by prejudice against members of the protected group." *Johnson v. Kroger Company*, 319 F.3d 858, 865 (6th Cir. 2003). Luciano's alleged comments require the inference that, because he did not like women running his branches, he decided to terminate Plaintiff's employment. *See Johnson*, 319 F.3d at 865 (finding that manager's comment "expressing concern about the potentially detrimental effect on business of having an African-American comanager" was not direct evidence of discrimination, because it "require[d] the inferential step of concluding that because [the defendant] held this belief, he would want to have Johnson's employment terminated."). Additionally, Luciano's comments regarding Plaintiff's child do not require the conclusion that Luciano discriminated against Plaintiff because of her capacity to become pregnant. *See Kocak*, 400 F.3d at 469-70.

*2. Circumstantial Evidence*

Defendant argues that Plaintiff cannot establish the first element of a prima facie case under the PDA because she was not pregnant at the time she was laid off, and because she has no evidence

15

that she was laid off because of her pregnancy. The Court agrees.

Plaintiff cites *Kocak, supra*, arguing that the law does not require her to be pregnant at the time of the adverse employment action. In *Kocak*, the Sixth Circuit found that the plaintiff could recover under the PDA if she could show that the defendant "refused to hire her because she might become pregnant again . . . ." *Id.* at 470. Plaintiff has not put forth any evidence that Luciano refused to allow her to return from maternity leave because he suspected Plaintiff would become pregnant again. Plaintiff has also failed to proffer any evidence that the hiring of Mark Natale, the refusal to bring her back immediately after her 12 weeks of maternity leave, Plaintiff's "demotion" to Assistant to the Regional Manager, and her eventual layoff, were linked in any way to Plaintiff's potential to become pregnant again. Plaintiff was allowed to work throughout her entire pregnancy, and was granted maternity leave when she had her child. Plaintiff has not offered any evidence that she was treated differently because of her pregnancy, or because Luciano or any other employee expected her to become pregnant again. Plaintiff has failed to provide any link between her pregnancy or potential to become pregnant and the adverse employment actions taken by Defendant.

Plaintiff argues that Luciano's comments regarding Plaintiff's care-taking responsibilities as a new mother qualify as discriminatory behavior under the PDA. This is not correct. The PDA only protects a woman's "decision to become pregnant or to work while being either pregnant or capable of becoming pregnant . . . ." *Int'l Union, United Auto., Aerospace and Agric. Implement Workers of Am. v. Johnson Controls, Inc.*, 499 U.S. 187, 206 (1991).

This argument may support a cause of action for "sex-plus" discrimination. "'Sex-plus' discrimination exists when a person is subjected to disparate treatment based not only on her sex, but on her sex considered in conjunction with a second characteristic." *Derungs v. Wal-Mart Stores,*

16

*Inc.*, 374 F.3d 428, 439 n. 8 (6th Cir. 2004). A sex-plus cause of action has been recognized by other courts in this District where a plaintiff alleges she was discriminated against for being a woman with small children. *See generally Philipsen v. University of Michigan Board of Regents*, No. 06-CV-11977, 2007 WL 907822 (E.D. Mich. Mar. 22, 2007) (Cleland, J.); *Walton v. Best Buy Company, Inc.*, No. 08-CV-15084, 2010 WL 3270120 (E.D. Mich. Aug. 17, 2010) (Murphy, J.). However, the Complaint does not contain a claim for sex-plus discrimination, and Plaintiff's brief in response to summary judgment does not argue sex-plus discrimination. Plaintiff's counsel also stated at the hearing on this matter that Plaintiff was not pursuing a claim for sex-plus discrimination. Accordingly, the Court will not further address this issue.

Although Plaintiff has failed to show a prima facie case under the PDA, Plaintiff has established a prima facie case of sex/gender discrimination. A prima facie case of sex/gender discrimination requires Plaintiff to show that: "(1) she is a member of a protected group, (2) she was subjected to an adverse employment action, (3) she was qualified for the position; and (4) she was replaced by a person outside the protected class, or similarly situated non-protected employees were treated more favorably." *Grace v. USCAR*, 521 F.3d 655, 677 (6th Cir. 2008). Plaintiff is member of a protected group, and her layoff qualifies as an adverse employment action. Plaintiff was also replaced by a male store manager.

Defendant argues that Plaintiff has not established the third element: that Plaintiff was qualified for the position of store manager. To meet this prong, Plaintiff must show "that she was performing at a level which met her employer's legitimate expectations." *Cline v. Catholic Diocese of Toledo*, 206 F.3d 651, 658 (6th Cir. 2000) (citations and punctuation omitted).

17

While Defendant points out a number of issues[3] that allegedly arose due to Plaintiff's management, Plaintiff at this point need only present sufficient evidence that would allow a reasonable juror to find in her favor. Dave Truttman, who was Plaintiff's regional manager at the time of her layoff, stated that the decision to layoff Plaintiff was not based on performance. (Truttman Dep. 27.) Truttman also testified that he "wanted [Plaintiff] in the store . . . because I didn't want to lose the customers that we gained with her." (Truttman Dep. 17.) Rex Sparks testified that Plaintiff was a valuable manager: "she was very thorough on helping me find out what accounts I need to pay attention to . . . [and] helped me on the pricing . . . ." (Sparks Dep. 10.) Mark Natale testified that he could not recall any employee expressing dissatisfaction with Plaintiff's job performance. (Natale Dep. 36.) The Court therefore finds that, viewing this evidence in the light most favorable to Plaintiff, it is sufficient for a reasonable juror to conclude that Plaintiff was meeting the legitimate expectations of her employer and was qualified for the position of store manager. Accordingly, Plaintiff has established a prima facie case of gender discrimination.

## B. Legitimate, Nondiscriminatory Reasons and Pretext

A defendant's proffered nondiscriminatory reason for an adverse employment action is pretextual if the plaintiff can show that defendant's reason "(1) has no basis in fact, (2) was not the actual reason, or (3) is insufficient to explain the employer's action." *Risch v. Royal Oak Police Dept.*, 581 F.3d 383, 391 (6th Cir. 2009). Defendant points to several events that it argues provided a legitimate, nondiscriminatory reason to discharge Plaintiff.

Defendant asserts that a bad economy causing poor sales at the Commerce Township location resulted in Plaintiff's layoff. However, Mark Natale testified that Plaintiff's layoff was not related

---

[3]These issues are addressed *infra* in the Court's analysis regarding pretext.

to market conditions.  (Natale Dep. 69.)  There is also evidence that Natale was allowed to hire an assistant manager for the Commerce Township store shortly after Plaintiff was laid off.  (Natale Dep. 40.)  Viewing this evidence in a light most favorable to Plaintiff, a reasonable juror could find that Defendant's market conditions reason is pretextual.

Defendant argues that $70,000 worth of inventory was unaccounted for while Plaintiff was the store manager.  Regarding this allegation, Dave Truttman testified that he spent an entire year investigating the missing inventory and "found nothing." (Truttman Dep. 10.)  Truttman opined that the missing inventory was actually attributable to the 2007-2008 inventory that had been performed prior to Plaintiff's promotion to store manager.  (Truttman Dep. 10.)  Plaintiff also testified that the 2007-2008 inventory had several discrepancies, which she brought to Terry Krohn's attention in an attempt to correct them.  (M. Brooks Dep. 21-23.)  The Court finds that, viewing this evidence in a light most favorable to the Plaintiff, a reasonable juror could find Defendant's proffered reason is a pretext.

Defendant argues that Plaintiff sold products at or below cost while she was the store manager.  However, Truttman testified that, due to pressure caused by some competitors' pricing, he had given Plaintiff permission to sell items below cost if she felt it needed to be done to make the sale.  (Truttman Dep. 20.)  Plaintiff testified that she did this for a dead inventory item that the customer would not have purchased unless it was discounted.  (M. Brooks Dep. 38-39.)  Viewing this evidence in a light most favorable to the Plaintiff, a reasonable juror could conclude that Defendant's proffered reason is a pretext.

Defendant asserts that Plaintiff was laid off because she double billed a customer.  Plaintiff claimed at her deposition that this was "a simple entry error" that occurred while she was in the

process of learning the new computer system Defendant was utilizing. (M. Brooks Dep. 68-69.) Plaintiff stated that she called Defendant's corporate offices in New York to resolve the issue, but "it was not handled the way it should have been." (M. Brooks Dep. 69.) Moreover, Plaintiff was learning the new computer system at the time the error occurred because Defendant would not grant her request to attend the previous manager training session in New York, which occurred in November while Plaintiff was on maternity leave. (M. Brooks Dep. 24-25.) Taking this evidence in a light most favorable to Plaintiff, a reasonable juror could conclude that Defendant's proffered reason is pretextual.

Defendant claims that Plaintiff accepted a personal check from a customer as payment for a sale, which constitutes grounds for her layoff. Plaintiff has denied ever receiving this check (M. Brooks Dep. 69), and Defendant admits that this allegation is based on a customer's review of its own records, which no employee of Defendant ever saw or verified. (Natale Dep. 51-53.) Taking this evidence in a light most favorable to Plaintiff, a reasonable juror could find Defendant's proffered reason was a pretext.

The Court further finds that Plaintiff has produced evidence of discriminatory remarks by a decision maker, which constitutes evidence of pretext. "Discriminatory statements made by individuals occupying managerial positions can be particularly probative of a discriminatory workplace culture." *Risch*, 581 F.3d at 393. The deposition testimony of Rex Sparks shows that Luciano allegedly made statements that he "did not like women working his branches," and "he doesn't want a woman there [at the Commerce Township store] and he was just trying, he was trying to keep her out . . . as long as he could to see if he could find a replacement . . . ." (Sparks Dep. 13, 15.) Defendant argues that the Court should not consider this statement on summary judgment

20

because it is hearsay that would be inadmissible at trial, but Luciano's alleged statement falls under the exception for the declarant's then-existing state of mind. *See Midwest Guaranty Bank v. Guaranty Bank*, 270 F. Supp. 2d 900, 917 (E.D. Mich. 2003).

Taking all of the above evidence in a light most favorable to Plaintiff, the Court finds that Plaintiff has produced sufficient evidence to establish a genuine issue of material fact concerning whether Defendant's proffered reasons for terminating her employment were pretextual.

## C. Retaliation

To establish a prima facie case of retaliation, Plaintiff must show that "(1) she engaged in activity protected by Title VII; (2) the defendant knew of her exercise of her protected rights; (3) the defendant subsequently took an adverse employment action against the plaintiff or subjected the plaintiff to severe or pervasive retaliatory harassment; and (4) there was a causal connection between the plaintiff's protected activity and the adverse employment action." *Barrett v. Whirlpool Corp.*, 556 F.3d 502, 516 (6th Cir. 2009). An employee engages in protected activity when she complains of unlawful employment practices to a manager, so long as the employee has a good-faith belief that the employer was acting in violation of Title VII. *Id.*

Plaintiff testified that she told Luciano on December 29, 2008, that she felt he was discriminating against her based on the fact that she is a woman, and based on her pregnancy. (M. Brooks Dep. 45.) Luciano denies that this conversation took place. (Luciano Dep. 8.) When Plaintiff was allowed to return to work two months later, Rex Sparks and Mark Natale both observed that Plaintiff's work was closely scrutinized by Luciano. The day Plaintiff was allowed to return to work, her husband, who worked at the same store, was laid off. Dave Truttman testified that when he was hired in the spring of 2009, Luciano began pressuring him to fire Plaintiff, which caused

21

Truttman to make Natale the store manager and create the position Assistant to the Regional Manager for Plaintiff.  On May 18, 2009, Luciano told Truttman that he needed to lay off two individuals, effectively eliminating Plaintiff's new position and employment.

In this case, Plaintiff has presented evidence that after her initial allegation of discrimination, Defendant began taking retaliatory measures.  Specifically, Luciano terminated Plaintiff's husband's employment, scrutinized Plaintiff's work, and pressured Plaintiff's manager to fire her, which eventually lead to the termination of Plaintiff's employment, all within five months.  Taking this evidence in the light most favorable to the non-moving party, Plaintiff has established a claim for retaliation.  *See Little v. BP Exploration & Oil Co.*, 265 F.3d 357, 364 (6th Cir. 2001) (holding that "the temporal proximity, when considered with the other evidence of retaliatory conduct, is sufficient to create a genuine issue of material [fact] as to whether Plaintiff was suspended and later terminated because he filed two EEOC complaints and complained of racially discriminatory treatment.").

## V.  CONCLUSION

For the reasons stated above, the Court will:

1. **GRANT** Defendant's Motion as to Plaintiff's claims of pregnancy discrimination arising out of the PDA, and

2. **DENY** Defendant's Motion as to Plaintiff's gender discrimination and retaliation claims.

**SO ORDERED**.

Dated: 11-28-11
       Detroit, Michigan

PAUL D. BORMAN
UNITED STATES DISTRICT JUDGE

22